**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

DANIEL GUZMAN-PADILLA,
    *Defendant-Appellant,*
    and

JUAN VASQUEZ-ROSALES,
    *Defendant-Appellant.*

Nos. 08-50114
08-50118

D.C. No.
CR-07-695-IEG

OPINION

Appeals from the United States District Court
for the Southern District of California
Irma E. Gonzales, Chief District Judge, Presiding

Argued and Submitted
April 7, 2009—Pasadena, California

Filed July 23, 2009

Before: Harry Pregerson and David R. Thompson,
Circuit Judges, and Jeremy Fogel,* District Judge.

Opinion by Judge Fogel

---

*The Honorable Jeremy Fogel, United States District Judge for the Northern District of California, sitting by designation.

## COUNSEL

Shaun Khojayan (argued) and Janet C. Tung, San Diego, California, for the appellants.

Mark R. Rehe (argued), San Diego, California, for the appellee.

**OPINION**

FOGEL, District Judge:

Daniel Guzman-Padilla ("Guzman") and Juan Vasquez-Rosales ("Vasquez") (collectively, "Appellants") appeal the district court's denial of their motions to suppress evidence discovered during a stop and search of their vehicle by U.S. Border Patrol agents on February 4, 2007 near the border between the United States and Mexico. Believing that Appellants' vehicle recently had crossed the border and was carrying contraband, Border Patrol Agent Marc Battaglini instructed that a controlled tire deflation device ("CTDD") be deployed in the vehicle's path. As intended, all four of the vehicle's tires were deflated within approximately a half-mile, and the vehicle pulled to the side of the highway.

In the district court, Appellants argued that suppression was required because the use of the CTDD converted the stop into an "arrest" for which the requisite probable cause was lacking, and because the unannounced use of the device amounted to excessive force. The government argued, and the district court agreed, that the stop was an investigative detention authorized under the rubric of *Terry v. Ohio*, 392 U.S. 1 (1968), and that it was conducted in a reasonable manner. The district court also rejected Guzman's request under *Brady v. Maryland*, 373 U.S. 83 (1963), for production of the Border Patrol's Policy Manual governing the use of CTDDs, finding that the manual was immaterial to the question of Fourth Amendment reasonableness.

Vasquez entered a guilty plea while reserving his right to appeal the court's denial of his motion to suppress. Guzman was found guilty following a bench trial on stipulated facts. In these consolidated appeals, the parties renew the contentions they made in the district court, but the government also contends that the stop was justified under the border search doctrine. We agree that the stop of Appellants' vehicle was a

valid seizure incident to an extended border search, and that the force used to effect the stop was not excessive. We therefore affirm.

## BACKGROUND

Our decision today is informed to a significant degree by the unique geographic and topographical features of the southeast corner of Imperial County, California, where the events underlying these appeals occurred. Of particular importance are two valleys called the A-7 and the Buttercup. Each consists of a rugged floor lined by tall sand dunes, many of which themselves contain interior valleys or depressions. Both valleys run uninterrupted from Mexico to a public campsite on the United States side of the border, where they converge. From that point, a paved road leads to Interstate 8. Border Patrol Agent Battaglini, a member of the Smuggler Targeting Action Team ("STAT") who for six years has been deployed extensively in this part of the Imperial Sand Dunes, is intimately familiar with the local terrain. In his experience patrolling the area in a variety of transports ranging from all-terrain vehicles to Ford Expeditions such as the one driven by Appellants on the day in question, substantial vehicular modifications—such as elevated suspension systems or special "paddle tires"—are necessary to cross the dunes that abut either valley. Thus, "unmodified" four-wheel-drive vehicles are confined to the valley floor, which forms an unbroken conduit from Mexico to the United States. The valleys also converge in a manner that affords observers at the Buttercup Campground an unobstructed view of exiting dune traffic. As such, the location of the campground, which is less than two miles from the border, corresponds to a natural choke point for the interception of illicit goods or persons. The flow of such goods and persons is considerable: at the time of the events in question, Battaglini had been involved personally in the arrest of fifty to sixty drug or alien smugglers in the area.

At about 8:30 AM on February 4, 2007, Battaglini and fellow Border Patrol Agent Michael Harrington began their sur-

veillance duty at the Buttercup Campground, training their sights on the outlets of the two valleys. Several times during the day, agents from the nearby Yuma Border Patrol Station drove into the A-7 Valley and reported no unusual vehicle sightings. The trickle of morning recreational traffic ebbed by early afternoon—likely because it was Super Bowl Sunday— and by mid-afternoon the dunes were empty. It was under these conditions that Appellants' white Ford Expedition emerged from the A-7 Valley at approximately 3:30 PM. When first sighted, the vehicle was approximately one and a half miles from the border. From a distance of about a half-mile, Battaglini made several observations. First, he considered the vehicle's speed—approximately twenty to twenty-five miles per hour—unusually fast for the terrain; he later testified that five miles per hour would be an appropriate speed to avoid "beating up" an ordinary four-wheel-drive vehicle. Second, he noticed that the vehicle bore no apparent modifications that would have permitted it to enter the valley from anywhere but its Mexican entrance to the south. Third, he observed that the vehicle lacked the orange safety flag and recreational permit required by the federal agency that manages the Imperial Dunes, and was driving in a straight path uncharacteristic of recreational use.

Battaglini radioed nearby members of the STAT Unit and informed them of the approaching vehicle. Soon thereafter, the Expedition drove directly past the agents' unmarked patrol cars, affording the agents a view into its fully enclosed interior. Battaglini observed that the entire rear portion of the cabin was covered by a black tarp, something which he had seen exclusively in vehicles ultimately stopped for smuggling. He also noted that the vehicle bore Mexican license plates, a feature he considered rare in the Imperial Sand Dunes. Battaglini watched as the vehicle proceeded toward the highway, rolling through a stop sign, and, after passing the desired entrance ramp, reversing course in the middle of the road.

Collectively, Battaglini's observations caused him to feel certain that the vehicle was smuggling drugs, aliens, or other

illicit goods, and he determined to stop it using a CTDD. The device consists of an accordion-like tray containing small, hollow steel tubes that puncture the tires of a passing vehicle and cause a gradual release of air. The vehicle then ordinarily may travel for approximately a quarter to a half of a mile before complete deflation occurs. Battaglini testified that the Border Patrol uses CTDDs in three instances: where a vehicle (1) has made a "confirmed illegal entry" from Mexico; (2) has been observed taking on or discharging narcotics or illegal aliens; or (3) fails to yield during an attempted stop, giving rise to pursuit. Battaglini also testified that the Border Patrol does not use CTDDs in the vicinity of bridges, hills, curves in the roadway, or metropolitan areas, or in the presence of heavy traffic. He testified that several agents typically coordinate with one another during deployment of a CTDD to keep other motor traffic away from both the suspect vehicle and the device. He explained that the Border Patrol uses CTDDs as a first resort because smugglers rarely yield to lights or sirens and frequently engage in desperate attempts to escape apprehension, including by crossing freeway medians, driving into oncoming traffic, and leading officers on high-speed pursuits. He testified that in multiple cases, the use of lights and sirens caused erratic behavior that resulted in the deaths of innocent bystanders.

Before authorizing deployment of the CTDD, Battaglini conferred with his supervisor by radio, confirming, based on the circumstances of its emergence from the A-7 Valley, that Appellants' vehicle had made an illegal entry. Battaglini and Harrington followed the vehicle for approximately ten miles before the device was deployed by another member of the STAT Unit. Presumably because it was the afternoon of Super Bowl Sunday, highway traffic was light, and the agents kept what little traffic there was away from the zone of deployment. The stretch of road where the device was deployed was open and flat, with no nearby structures, hills, or other hazards. After Appellants' vehicle passed over the spike strip, both agents activated their lights and sirens. The Expedition

proceeded approximately a half-mile before its tires went flat and it pulled to the side of the road.

As Battaglini stepped out of his vehicle, the door of the Expedition swung open and Vasquez began to exit. At that moment, Battaglini encountered a strong odor of marijuana. He approached the vehicle with his weapon drawn and ordered Vasquez to remain inside. When he reached the vehicle, he removed Vasquez, handcuffed him, ordered him onto his knees, and patted him down. Agent Harrington restrained Guzman. The agents then discovered approximately 479.95 kilograms (1,058.1 pounds) of marijuana, which had an estimated retail value of $670,000 in Imperial County.

Vasquez and Guzman were indicted on charges of possession with intent to distribute 100 kilograms or more of marijuana. The district court held three days of evidentiary hearings on their motions to suppress, during which the government relied exclusively on the testimony of Battaglini, while the defense offered a declaration by Vasquez and the testimony of Robert Davidson, a recreational user of the Imperial Sand Dunes who visits the area several times a year. When the district court denied the motions to suppress, the defense moved for reconsideration and offered the declaration of Jack Smith, a use-of-force expert who stated in essence that tire deflation devices are dangerous and unjustified under the circumstances that were present. Unpersuaded by Smith's declaration, the district court reaffirmed its prior ruling.

## ANALYSIS

**[1]** When a vehicle is stopped by law enforcement, all of its occupants are "seized" for Fourth Amendment purposes. *Brendlin v. California*, 127 S.Ct. 2400, 2406-08 (2007). In determining whether such a seizure comports with the Fourth Amendment, "the touchstone . . . is reasonableness." *United States v. Kriesel*, 508 F.3d 941, 947 (9th Cir. 2007) (quoting *Samson v. California*, 547 U.S. 843, 855 n.4 (2006)). The

"general Fourth Amendment approach" requires courts to examine the totality of the circumstances to determine whether a search or seizure is reasonable. *United States v. Knights*, 534 U.S. 112, 118 (2001) (citation omitted).

The first aspect of the reasonableness inquiry concerns the level of suspicion that the government's agents must possess to justify their intrusions. Without such justification, a seizure is per se unreasonable. Traditionally, all Fourth Amendment "seizures" constituted "arrests" and therefore required probable cause. *Dunaway v. New York*, 442 U.S. 200, 208-09 (1979). Departing from the traditional rule, the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), "recognized an exception" to the probable cause requirement for police encounters that were "much less severe [in their intrusiveness] than . . . traditional 'arrests,' " holding that reasonable suspicion would suffice. *Dunaway*, 442 U.S. at 209. The reasonable suspicion/probable cause framework remains binary in nature, *see Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993), with the proviso that under the border search doctrine, law enforcement may conduct certain searches and seizures at the border without any suspicion, *United States v. Alfonso*, 759 F.2d 728, 733-34 (9th Cir. 1985).

The second aspect of the inquiry concerns the manner in which a seizure is conducted—typically whether law enforcement used excessive force. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989) ("[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out." (emphasis removed)). "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . . " *Id.* (emphasis removed). In so doing, courts consider the totality of the circumstances, *Samson*, 547 U.S. at 848, and "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the

governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (citation omitted).

In accordance with these principles, we must determine as a threshold matter what level of suspicion was required to render the Border Patrol agents' stop of Appellants' vehicle "reasonable." The possible justifications for intrusion range from no suspicion if the seizure was incident to a "border search" or its functional equivalent, to "reasonable suspicion" if the seizure was incident to an "extended border search," to probable cause if the seizure nonetheless constituted an "arrest."[1] Next, we must decide whether the manner in which the agents effected the stop was excessively forceful and therefore unreasonable.

---

[1]Appellants contend that the government waived the border search argument by failing to present it to the district court. While matters not presented to the trial court generally may not be raised for the first time on appeal, *United States v. Flores-Payon*, 942 F.2d 556, 558 (9th Cir. 1991), "the Supreme Court has made clear [that] it is claims that are deemed waived or forfeited, not arguments." *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) (citing *Lebron v. Nat'l Railroad Passenger Corp.*, 513 U.S. 374, 378-79 (1995)); *see also Lebron*, 513 U.S. at 377-80; *Yee v. Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

Here, while the government made no mention of border searches in the district court, it consistently has claimed that the seizure of Appellants' vehicle did not require probable cause. The border search justification is merely an additional argument raised in support of that claim. Moreover, all of the factual predicates of a border search were fully litigated below. Accordingly, we may consider the government's argument that the seizure falls within the border search rubric, and we must determine only whether the record supports the government's legal position.

## I.  SEARCHES AND SEIZURES AT THE BORDER

### A.  General Principles

**[2]** The legality of a border search is reviewed *de novo*. *United States v. Romm*, 455 F.3d 990, 996 (9th Cir. 2006). The border search doctrine is a partial exception to the Fourth Amendment's limitations on searches and seizures. *United States v. Ramsey*, 431 U.S. 606, 616-19 (1977). "The primary purpose of a border search is to seize contraband property sought to be brought into the country." *Alfonso*, 759 F.2d at 733 *(citing Alexander v. United States*, 362 F.2d 379, 382 (9th Cir. 1966)). Accordingly, at least with respect to the Fourth Amendment's suspicion requirements, a routine border search "is by its very nature reasonable." *United States v. Dobson*, 781 F.2d 1374, 1376 (9th Cir. 1986).

**[3]** Border searches need not occur at an actual border, but may take place at the "functional equivalent" of a border, or at an "extended" border. *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir. 1985); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982). Searches conducted at the functional equivalent of a border require no suspicion, provided that they are not "unreasonably intrusive." *United States v. Seljan*, 547 F.3d 993, 1002-03 (9th Cir. 2008). Extended border searches, which "occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy[,] . . . must be justified by 'reasonable suspicion' that the subject of the search was involved in criminal activity." *Alfonso*, 759 F.2d at 734 (citing *United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1422-23 (9th Cir. 1984)); *see also United States v. Garcia*, 672 F.2d 1349, 1367 (11th Cir. 1982). Either type of border search requires that law enforcement possess a "reasonable certainty" that a border has been crossed, either by the vehicle in question, or by contraband suspected to be within the vehicle. *See United States v. Sahanaja*, 430 F.3d 1049, 1053-54 (9th Cir. 2005).

### B.   Classification of the subject search and seizure

The government argues that the search and seizure at issue here occurred at the functional equivalent of the border. We are inclined to disagree. Our cases are consistent with the Fifth Circuit's observation that "[t]he main difference between the functional equivalent of the border search and an extended border search is that the latter takes place after the first point in time when the entity might have been stopped within the country." *United States v. Niver*, 689 F.2d 520, 526 (5th Cir. 1982); *see United States v. Abbouchi*, 502 F.3d 850, 855-56 (9th Cir. 2007) (holding that centralized parcel processing hub provided the "last practicable opportunity" for customs agents to inspect foreign-directed packages, notwithstanding the possibility that the packages might stop at other points before leaving the country); *United States v. Potter*, 552 F.2d 901, 907 (9th Cir. 1977) (holding that the first practicable opportunity to conduct a search of an international flight is the first domestic point of arrival). Here, although Appellants' vehicle passed the agents' unmarked patrol cars at approximately five to ten miles per hour upon exiting the Buttercup Campground, the agents followed the vehicle onto the highway for nearly ten miles. While it may well have been inadvisable to stop the vehicle before it had passed several points at which suspects frequently flee in a dangerous manner towards Mexico when pursued by law enforcement, we doubt whether it was wholly "impracticable" for the agents to do so, particularly since the situation at hand hardly appears to have been unique.

By contrast, the extended border search doctrine clearly contemplates the situation we confront here. "Extended border searches are typically separated from the border by 'a greater spatial and temporal distance' from the actual border than searches at the functional equivalent of the border," *Abbouchi*, 502 F.3d at 855 (citing *Cardona*, 769 F.2d at 628), and encompass a wide range of spatial and temporal relationships with the border, *see, e.g.*, *Alfonso*, 759 F.2d at 734-35

(upholding extended border search of boat thirty-six hours after it crossed the border); *United States v. Martinez*, 481 F.2d 214 (5th Cir. 1973) (finding that search conducted one-hundred-fifty miles from the border and one-hundred-forty-two hours after a border crossing was an extended border search); *Rodriquez-Gonzalez v. United States*, 378 F.2d 256 (9th Cir. 1967) (finding that search conducted fifteen hours after a border crossing at a distance of twenty miles from the border was an extended border search). The flexibility inherent in the extended border search doctrine reflects a balancing of the individual's right to freedom from arbitrary intrusions against the "myriad difficulties facing customs and immigration officials who are charged with the enforcement of smuggling and immigration laws." *United States v. Richards*, 638 F.2d 765, 771 (1981). That flexibility has led us to define an extended border search as any "search away from the border where entry is not apparent," *United States v. Corral-Villavicencio*, 753 F.2d 785, 788 (9th Cir. 1985) (emphasis added), but where the dual requirements of reasonable certainty of a recent border crossing and reasonable suspicion of criminal activity are satisfied. *Sahanaja*, 430 F.3d at 1053-54.

There are two reasons why we need not decide precisely what type of border search occurred here. First, the seizure required to effect the search of Appellants' vehicle clearly was more than a "routine" search of the kind permissible in the absence of suspicion. Highly intrusive searches require reasonable suspicion, even if they are conducted at the functional equivalent of the border. *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) (emphasis added); *see also Seljan*, 547 F.3d at 1001-02. In assessing whether a vehicle search is sufficiently intrusive to require reasonable suspicion, we focus on "two main issues: (1) Did the search damage the vehicle in a manner that affected the vehicle's safety or operability, and (2) Was the search conducted in a particularly offensive manner." *United States v. Cortez-Rivera*, 454 F.3d 1038, 1042 (9th Cir. 2006). The damage factor alone is decisive here because Appellants' vehicle was

rendered inoperable when its tires were destroyed in the course of the seizure. *Cf. Flores-Montano*, 541 U.S. at 155-56 (authorizing suspicionless disassembly and reassembly of gas tank); *Cortez-Rivera*, 454 F.3d at 1042-43 (authorizing customs agents to pry open quarter of vehicle's interior door panel without particularized suspicion); *United States v. Cortez-Rocha*, 394 F.3d 1115, 1125 (9th Cir. 2005) (authorizing suspicionless slashing of spare tire to search for contraband); *United States v. Chaudhry*, 424 F.3d 1051, 1053-55 (9th Cir. 2005) (authorizing suspicionless exploratory drilling of small hole in truck bed). Thus, even if the seizure were deemed incident to a functional-equivalent border search, the requirements of an extended border search—reasonable certainty of a border crossing and reasonable suspicion of criminal activity—would have to be satisfied.

**[4]** Second, as we explain below, and as Appellants effectively concede, the presence of reasonable suspicion is beyond dispute in this case. We are constitutionally forbidden from issuing advisory opinions, and we decline to decide a "dispute over whether or not a particular search may be conducted in the absence of any suspicion[,] [where that dispute] is an entirely fictional construct." *Chaudhry*, 424 F.3d at 1054-55 (B. Fletcher, J., specially concurring) (emphasis removed). Accordingly, in this instance the government must demonstrate that its agents possessed a reasonable certainty that a border crossing had occurred and reasonable suspicion that criminal activity was afoot. Because the subject search appears to fit most comfortably within the extended border search doctrine, we will evaluate it as such for the sake of clarity.

## C.   Reasonable certainty of crossing

**[5]** We assess the existence of reasonable certainty of a border crossing by examining "the totality of the surrounding circumstances, including the time and distance elapsed [from the border] as well as the manner and extent of surveillance."

*Alexander*, 362 F.2d at 382. These circumstances must be "such as to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of search was aboard the vehicle at the time of entry into the jurisdiction of the United States." *Id.* The issue is "not . . . whether the vessel [or vehicle] actually crossed into the United States territory, but whether the searching . . . officers were reasonably certain that it did." *Tilton*, 534 F.2d at 1366. Thus, an agent or officer need not have observed the crossing. *United States v. Bennett*, 363 F.3d 947, 950 (9th Cir. 2004); *Dobson*, 781 F.2d at 1376; *United States v. Stanley*, 545 F.2d 661, 666 n.6 (9th Cir. 1976). As a corollary, while "continuity of surveillance over the subject of the search is a factor in determining identity," *Alfonso*, 759 F.2d at 735 (citing *Caicedo-Guarnizo*, 723 F.2d at 1422), it is not required, *see Potter*, 552 F.2d at 907*; United States v. Driscoll*, 632 F.2d 737, 739 (9th Cir. 1980); *Leeks v. United States*, 356 F.2d 470, 471 (9th Cir. 1966).

Reasonable certainty "is a higher standard than that of probable cause, [but] it does not require knowledge beyond a reasonable doubt." *Corral-Villavicencio*, 753 F.2d at 788 (citing *Kessler*, 497 F.2d at 279). Rather, "the totality of the facts and circumstances within the officers' knowledge and of which they have *reasonably trustworthy information* [must] be sufficient in *the light of their experience* to warrant a firm belief that a border crossing has occurred." *Tilton*, 534 F.2d at 1366-67 (emphasis added); *see also Potter*, 552 F.2d at 907 (reaffirming that absolute certainty is not required).

Application of the extended border search doctrine may be defeated when "conditions . . . have become so vulnerable to change after a border crossing as to rebut any reasonable certainty that contraband later found was aboard a carrier at entry." *Alfonso*, 759 F.2d at 736. In *United States v. Petersen*, 473 F.2d 874 (9th Cir. 1973), for example, officers lost sight of a vehicle for ten minutes after it crossed the border, during which time the driver picked up two passengers. It therefore

was not reasonably certain that the contraband ultimately recovered was in the vehicle when it crossed the border. *Id.* at 876. In *United States v. Anderson*, 509 F.2d 724 (9th Cir. 1975), the vehicle in question made several stops at the border crossing, picking up and discharging passengers, one of whom was seen retrieving a package hidden near a palm tree. It therefore was most reasonable to infer that contraband found in the vehicle had been retrieved from near the tree. *Id.* at 726. Similarly, in *United States v. Perez*, 644 F.2d 1299, 1302 (9th Cir. 1981), customs agents did not see the vehicle in question until it was in the middle of a busy town three miles north of the border. Accordingly, there could have been no reasonable certainty that any contraband found in the vehicle had crossed the border. *Id.*

[6] In the case before us, several factors appear to support a finding of reasonable certainty. First, the outlet of the A-7 Valley, from which Battaglini first observed Appellants' vehicle, lies only one and a half miles from the Mexican border. Second, Battaglini testified that the large dunes flanking the valley between its origin in Mexico and its terminus in the United States are impassible to all but specially modified vehicles, and that Appellants' vehicle did not appear to be specially equipped or modified. Third, Battaglini stressed that the absence of any reports of vehicle traffic in the A-7 by roving border patrol vehicles earlier in the day eliminated the possibility that Appellants' vehicle merely had lingered in the area from the previous day. Finally, he observed that the vehicle's unusual speed and unwavering trajectory suggested the absence of any recreational purpose.

In the district court, the defense offered the testimony of Robert Davidson, an off-road vehicle enthusiast who visits the Imperial Sand Dunes several times a year. Davidson stated that he had been able to traverse the A-7 dunes in unmodified vehicles, but he admitted that his vehicle was fitted with larger-than-normal tires. Davidson also indicated the existence of several alternate routes at the northern end of the A-

7 Valley, the availability of which might negate the inference that a vehicle emerging from the valley at the Buttercup Campground necessarily had traveled north from the valley's Mexican flank. These routes, however, either required traversal of the sand dunes, were under relayed surveillance, or had long been closed to traffic by physical barriers—all facts known to Battaglini on the day in question. In rebuttal testimony, Battaglini maintained that the dunes were impassable to ordinary four-wheel-drive vehicles, and the district court made an express factual finding that Battaglini's testimony was "much more believable and . . . based on much more experience than [that of] Mr. Davidson, who goes out [to the Imperial Dunes] four times a year." The district court noted that Battaglini was "out there every single day and has seen hundreds . . . [and] probably thousands of vehicles."

[7] The evidence offered in the district court was sufficient to establish a "reasonable certainty" that a border crossing had occurred, such that any contraband found in Appellants' vehicle confidently could be considered to have crossed the border. That Battaglini did not see the actual crossing or maintain continuous surveillance over the vehicle from the time of suspected crossing is not determinative under our case law. Given the unique topographical and geographic features of the area in question, Battaglini's "vantage point . . . enabled him to be reasonably certain that the [vehicle] he saw came from Mexican [territory]." Bennett, 363 F.3d at 950-51. Appellants have identified no "defect[s] of certainty" that would defeat such a finding, and conditions had not "become so vulnerable to change after [the] border crossing as to rebut" the inferences reasonably drawn from Battaglini's observations. *Cf. Alfonso*, 759 F.2d 736. The vehicle was spotted not in a busy town several miles from the border, *cf. Perez*, 644 F.2d at 1302, but in an empty desert less than two miles from the border and accessible only through a valley originating in Mexico and forming a unitary path to the observation point at which Battaglini was stationed. There is no reason to suspect that additional passengers or contraband were retrieved from

this desolate, sand-swept area. *Cf. Anderson*, 509 F.2d at 726. Thus, irrespective of whether Battaglini could have been *absolutely* certain that the vehicle had crossed the border, as he claims, the record supports a finding of "reasonable certainty" that a border crossing had occurred.

## D.  Reasonable suspicion

**[8]** Determinations of reasonable suspicion are reviewed *de novo*, while factual findings underlying those determinations are reviewed for clear error, giving "due weight to inferences drawn from those facts by resident judges and local law enforcement." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). "In the context of Border Patrol searches, the factors to be considered in determining whether 'reasonable suspicion' exists to justify stopping a vehicle include, but are not limited to: 1) characteristics of the area; 2) proximity to the border; 3) usual patterns of traffic and time of day; 4) previous alien or drug smuggling in the area; 5) behavior of the driver, including 'obvious attempts to evade officers'; 6) appearance or behavior of passengers; 7) model and appearance of the vehicle; and, 8) officer experience." *United States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)).

The government points to the following facts to support a finding that Battaglini's suspicion of criminal activity was reasonable: the area's well-known use as a smuggling route; the agents' "reasonable certainty" that Appellants' vehicle had just crossed illegally from Mexico; the vehicle's failure to display the required use permit or orange recreational safety flag; the vehicle's Mexican plates, which Battaglini

considered rare in the dunes; the vehicle's straight trajectory and unusually high speed when traveling over the rough, washboard-like road to the Buttercup Campground, and its haste and sudden maneuvers in accessing the highway, followed by its slow and cautious speed once on the highway; and, finally, the covering of the rear interior compartment of the vehicle by a black tarp even though the rear windows already were "blacked out."

**[9]** Based on these facts, largely in the form of testimony by Battaglini, the district court found that "there were many, many factors that . . . could lead to only one conclusion, and that was that this vehicle was smuggling either aliens or drugs." Independent of the district court's conclusion, nearly every one of the factors used to evaluate whether an officer possessed the requisite degree of suspicion supports a finding that Battaglini's suspicion was reasonable. While Appellants did raise a question as to whether the vehicle merely might have made a "detour" into Mexico from one of several nearby locations in the United States before returning through the A-7 Valley, that suggestion is inconsistent with the totality of the other circumstances surrounding the emergence of the vehicle. The circumstances were more than sufficient to "paint a picture that would create in the mind of a trained border patrol agent a reasonable suspicion that the [vehicle's occupants were] engaged in criminal activity." *United States v. Franco-Munoz*, 952 F.2d 1055, 1058 (9th Cir. 1991).

## II.  SEIZURES INCIDENT TO BORDER SEARCHES

Having established that the agents were entitled to conduct an extended border search of Appellants' vehicle, we pause to address Appellants' contention that the border search doctrine has no place in assessing the reasonableness of a related Fourth Amendment seizure, and that our *Terry*-stop jurisprudence should control.[2] Appellants are correct that the govern-

---

[2]Appellants also argue that the extended border search doctrine is inapplicable because the agents here were not "concerned with 'sweeping in'

ment's success in demonstrating an entitlement to conduct a border search does not end our inquiry, since there remains the possibility that the incidental detention or seizure amounted to an "arrest" requiring probable cause, or that the manner of the detention or seizure was otherwise unreasonable. But our cases confirm that under appropriate circumstances, Fourth Amendment seizures may be analyzed entirely within the confines of the border search doctrine. *See, e.g.*, *United States v. Nava*, 363 F.3d 942 (9th Cir. 2004); *United States v. Bravo*, 295 F.3d 1002 (9th Cir. 2002); *United States v. Zaragoza*, 295 F.3d 1025 (9th Cir. 2002); *United States v. Espericueta-Reyes*, 631 F.2d 616 (9th Cir. 1980). Our initial task in this case is to determine the proper legal framework for evaluating the reasonableness of the seizure at issue.

In *United States v. Bravo*, 295 F.3d 1002 (9th Cir. 2002), we addressed the issue of whether a border-related detention had evolved into an "arrest" requiring probable cause. The detention occurred at a fixed border crossing and was incident to a border search that we strongly suggested was "routine." *Id.* at 1006-08. Under those circumstances, we noted that "the *Terry*-stop framework is an inexact tool for use in the context of border stops and searches . . . [because] officials can engage in routine searches and questioning without any suspicion whatsoever." *Id.* at 1011-12 n.8. Finding that "[o]ur *Terry*-stop jurisprudence [was] simply less helpful than the border search cases which we [chose to] appl[y]," we asked "whether, under the totality of the circumstances, a reasonable innocent person would feel free to go after questioning, or, more specifically, whether the person would believe that he was being subjected to 'more than a temporary detention

---

accomplices of the carrier of contraband." *See United States v. Espericueta-Reyes*, 631 F.2d 616, 620 & n.4 (9th Cir. 1980). It is well settled, however, that "[n]ot all extended border searches are concerned with 'sweeping in' " such accomplices. *Id.* Indeed, this motivation scarcely has been discussed in the numerous extended border search cases that we have decided since *Espericueta-Reyes*.

occasioned by border crossing formalities.' " *Id*. at 1009-12 & n.8 (citations omitted).

While the "fit" between the *Terry*-stop framework and border searches undoubtedly is "imperfect," *id.*, the situation we face here—a decidedly non-routine stop of an individual at a location other than a fixed border crossing—still implicates considerations traditionally addressed under the *Terry* rubric. We therefore "use the *Terry*-stop cases to guide our analysis." *Bravo*, 295 F.3d at 1015 n.1 (Paez, J., dissenting). At the same time, however, we recognize that *"special rules apply at the border." United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001); *see also Nava*, 363 F.3d at 946 (rejecting appellant's reliance on "numerous cases that stand for the notion that an effective seizure by the police amounts to an arrest requiring probable cause," since the conduct in each of those cases "d[id] not take place at the border")*; Bravo*, 295 F.3d at 1009 (noting that because "special rules apply at the border[,] . . . . the fact that these events occurred at the border influences our inquiry into whether a reasonable innocent person would have believed that he was under arrest" (internal quotation marks and citation omitted)); *United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir. 2000) ("[T]he government has more latitude to detain persons in a border-crossing context."); *United States v. RRA-A*, 229 F.3d 737, 743 (9th Cir. 2000) (same). Moreover, while extended border searches "occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy," *Alfonso*, 759 F.2d at 734, thus implicating the Fourth Amendment balance, the special rules of the border still "influence[ ] our inquiry" into whether a particular detention constitutes a *de facto* arrest, *Bravo*, 295 F.3d at 1009, and our *Terry* jurisprudence serves as no more than a "guide." Bearing in mind that our analysis proceeds in the context of an extended border search, we now consider whether the February 4, 2007 stop of Appellants' vehicle would have been authorized as an investigative stop under *Terry*.

## A.    Seizure as investigative detention versus arrest

**[10]** The Supreme Court "has been careful to maintain [the] narrow scope" of *Terry*'s exception to the probable cause requirement, and has referred to *Terry* stops as a "*sui generis* 'rubric of police conduct.'" *Dunaway*, 442 U.S. at 209-10 (quoting *Terry*, 392 U.S. at 20). Thus, in describing the types of stops authorized by *Terry*, the Court has noted their "brief" and "minimal[ly] intrusi[ve]" nature. *Id*. at 211 n.13; *see also Arizona v. Johnson*, 129 S.Ct. 781, 786 (2009) (noting that *Terry* authorizes a "brief detention"). Beyond this general consideration, two specific, objectively based inquiries typically are used to determine whether a particular seizure fits within the investigative detention framework: one inquiry is undertaken from the perspective of the person being detained, the other from the perspective of law enforcement. These inquiries frequently are "fused into one analysis." *Bravo*, 295 F.3d at 1011-12 n.8.

**[11]** First, it is well-established that intrusive measures may convert a stop into an arrest if the measures would cause a reasonable person to feel that he or she will not be free to leave after brief questioning—i.e., that indefinite custodial detention is inevitable. *Kraus v. Pierce County*, 793 F.2d 1105, 1109 (9th Cir. 1986) ("[W]here force is used such that the innocent person could reasonably have believed he was not free to go *and* that he was being taken into custody indefinitely, an arrest has occurred." (emphasis added)); *accord Bravo*, 295 F.3d at 1009 ("The standard for determining whether a person is under arrest is not simply whether a person believes that he is free to leave, but rather whether a reasonable person would believe that he is being subjected to more than [a] 'temporary detention . . . .'" (quoting *Butler*, 249 F.3d at 1100)); *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) ("There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave *after brief questioning*." (emphasis added) (quoting *United States v. Del Vizo*, 918 F.2d 821, 824

(9th Cir. 1990)). Of course, the "reasonable person" test pre-supposes an innocent person. *Florida v. Bostick*, 501 U.S. 429, 438 (1991).

**[12]** Second, because "[t]he purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence," *United States v. Taylor*, 716 F.2d 701, 708 (9th Cir. 1983) (internal quotation marks and citation omitted), "we allow intrusive and aggressive police conduct without deem-ing it an arrest . . . when it is a reasonable response to legiti-mate safety concerns on the part of the investigating officers." *Miles*, 247 F.3d at 1012-13 (quoting *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996)); *see also Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable" in the course of a *Terry* stop). As a result, officers with a particular-ized basis to believe that a situation may pose safety risks may handcuff or point a gun at an individual without convert-ing an investigative detention into an arrest. *See Miles*, 247 F.3d at 1013; *Alexander*, 64 F.3d at 1320 (holding that offi-cers could order individuals from car at gunpoint and hand-cuff them in the course of a *Terry* stop).

The second inquiry frequently proves determinative. As the First Circuit recognized in *United States v. Acosta-Colon*, while

> [i]t is often said that an investigatory stop constitutes a *de facto* arrest when a reasonable man in the sus-pect's position would have understood his situation . . . to be tantamount to [an] arrest[,] . . . . in a typical borderline case, e.g., one in which the detention at issue has one or two arrest-like features but other-wise is arguably consistent with a *Terry* stop, it will not be obvious just how the detention at issue ought

reasonably to have been perceived; indeed, this will be the central point of contention. Thus, in . . . a case . . . where the detention is distinguishable from, yet has some features normally associated with, an arrest[,] . . . the analysis must revert to an examination of whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a *Terry*-type stop. This assessment requires a fact-specific inquiry into whether the measures used were reasonable in light of the circumstances that prompted the stop or that developed during its course.

157 F.3d 9, 14-15 (1st Cir. 1998) (quotation marks and citations omitted). Our analysis in *Miles* implicitly adopts this logic: while the officers' conduct in *Miles*—approaching the suspect with drawn weapons, ordering him to his knees, and handcuffing him without any explanation that the detention was "temporary"—may or may not have caused a reasonable person to believe that he was under arrest, we focused exclusively on whether the use of force was justified under the circumstances. *See Miles*, 247 F.3d at 1012-13. Concluding that it was, we held that the use of force did not transform the detention into an arrest. *Id.*

## B.   The February 4, 2007 stop

[13] While anyone in Appellants' situation would have felt constrained to remain at the scene immediately after his or her tires had been deflated and as agents approached the vehicle, it does not follow that the mere use of a CTDD to stop the vehicle would have caused an innocent person to believe that a prolonged custodial detention amounting to an arrest was about to occur.[3] Even if he or she were aware that his or her

---

[3]Appellants contend only that the use of the CTDD rendered the stop a *de facto* arrest, not that other intrusive measures employed during the stop subsequently transformed it into an arrest.

tires had been deflated intentionally[4] and that the police were in pursuit, an innocent motorist would assume that a mistake had been made, and that the mistake could be corrected through contact and communication with the police. Undoubtedly, if the police continued to exhibit signs of an intent to arrest after interacting with the motorist, the motorist reasonably might believe that an arrest was in progress. But the facts of this case simply do not reflect such a scenario, and we cannot say that an innocent motorist necessarily would have believed that the use of the spikes made an indefinite custodial detention inevitable.

[14] We also are persuaded by the government's justification for using the relatively more intrusive CTDD method to stop the vehicle. The facts known to Battaglini suggested a high likelihood of smuggling activity: the area is a known smuggling hotspot; Battaglini was at least "reasonably certain" that the vehicle had made an illegal border crossing; the vehicle had tinted windows and a tarp covering its posterior contents; it bore no marks of recreational use and proceeded hastily out of the dunes in a manner inconsistent with recreational activity; and it abruptly adjusted its speed from excessively fast in the recreational area to considerably below the speed limit on the highway. These facts led Battaglini to classify Appellants' approach as a "confirmed illegal entry." As Battaglini testified, vehicles exiting the A-7 and Buttercup Valleys under these particular circumstances rarely have yielded to the police and frequently have engaged in dangerous maneuvers that endanger innocent members of the public. Together, these "specific . . . circumstance[s] . . . supported a reasonable belief that the use of [force] was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect[s] . . . to an undue risk of harm." *Acosta-Colon*, 157 F.3d at 19.

---

[4]In the related case of *United States v. Cota-Mora*, which we also decide today, the Border Patrol agent testified that he had driven unintentionally over spike strips on several occasions, and that the experience was akin to traveling over a small "bump on the road."

**[15]** Were we faced with an ordinary vehicle seizure unrelated to the "myriad difficulties facing customs and immigration officials who are charged with the enforcement of smuggling and immigration laws," *Richards*, 638 F.2d at 771, we might hesitate to classify the seizure of Appellants' vehicle as an investigative detention, given the practical reality that the stop rendered Appellants' vehicle inoperable until the tires could be repaired or replaced. We have noted that the "duration of detention is critically important" in determining whether a stop has become an arrest, *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981), and while a detention might be said to occur only so long as law enforcement actually detains the vehicle's occupants, the condition of their vehicle clearly would have subjected Appellants to considerable delay in going about their business. Nonetheless, because this was not an ordinary roadside vehicle stop but one authorized under the border search doctrine, where the government's powers are at their "zenith," *Seljan*, 497 F.3d at 1041 (citing *Flores-Montano,* 541 U.S. at 152), we are satisfied that the potential practical implications of deploying a CTDD do not warrant treatment of the stop as an arrest.[5]

### III.   EXCESSIVE FORCE

**[16]** While our determination that the use of force against Appellants' vehicle failed to transform the stop into an arrest strongly suggests that the same use of force was not "excessive," we provide a brief independent discussion of Appellants' excessive force claim, which stems principally from their contention that spike strips are dangerous and inappropriate for use as a first resort. "An otherwise lawful seizure can violate the Fourth Amendment if it is executed in an unreasonable manner." *Alverez-Tejeda*, 491 F.3d 1013, 1016

---

[5]It is undisputed that probable cause to conduct a full-scale search arose at the latest when the agents encountered the smell of unburned marijuana emanating from the vehicle. *See United States v. Garcia-Rodriguez*, 558 F.2d 956, 964-65 (9th Cir. 1977).

(9th Cir. 2007). We review *de novo* whether a particular search or seizure was carried out in a reasonable manner. *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994). "To assess the reasonableness of th[e] conduct, [a court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," *Alverez-Tejeda*, 491 F.3d at 1016 (quoting *United States v. Jacobsen*, 466 U.S. 109, 125 (1984)), paying "careful attention to the facts and circumstances of each particular case," *Graham*, 490 U.S. at 396. Searches and seizures at the border are no less subject to this balancing. *See, e.g.*, *United States v. Des Jardins*, 747 F.2d 499, 504-05 (9th Cir. 1984).

## A.  Governmental interests

The government's power at the border has an "impressive historical pedigree," *Flores-Montano*, 541 U.S. at 153, stemming from its dual interests in "protecting . . . its territorial integrity," *id.*; *see also Seljan*, 497 F.3d at 1040, and in "stop[ping] . . . drugs before they reach[ ] their ultimate destination," *Alverez-Tejeda*, 491 F.3d at 1016; *see also United States v. Cardenas*, 9 F.3d 1139, 1149 (5th Cir. 1993) ("The major impetus behind the extended border search doctrine is 'the government interest in stopping drug traffic.' " (citation omitted)). In addition, the border patrol has a critically important interest in protecting itself and the public during stops of suspected smugglers. As Battaglini testified in this case, "smuggling suspects who are confronted with a show of authority near the border often resort to desperate means to avoid apprehension," such as crossing freeway medians, driving into oncoming traffic, and leading officers on high-speed chases. Appellants consistently have failed to dispute or even acknowledge this important consideration, which weighs heavily in favor of permitting border patrol agents to employ non-conventional means to protect the motoring public.

### B.  Extent and nature of the intrusion

Notwithstanding the strength of the government's interests, the extent of the intrusion here should not be trivialized. In assessing the extent to which a particular vehicle stop intrudes upon Fourth Amendment expectations and rights, the Supreme Court has considered the "subjective intrusion" effected by a stop, namely, "the generating of concern or . . . fright on the part of *lawful* travelers." *Mich. Dept. of State Police v. Sitz*, 496 U.S. 444, 452 (1990) (emphasis added) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976)). In *Sitz*, the Court upheld the use of fixed sobriety checkpoints as sufficiently unintrusive to be reasonable under the circumstances, noting that motorists (1) could see that other vehicles were being stopped, (2) were visibly aware of the officers' legitimate authority, and (3) were only minimally inconvenienced by the stops, which lasted on average twenty-five seconds. *Id*. at 448-55. In contrast to the fixed check-points approved in *Sitz*, the use of tire deflation devices by roving patrols will be unexpected and "may frighten motor-ists." *Id*. at 453 (quoting *Martinez-Fuerte*, 428 U.S. at 558). To some extent, the sudden deployment of tire deflation devices also may "inflict . . . indignity and arouse . . . resent-ment" on the part of law-abiding motorists. *Cf. Bond v. United States*, 529 U.S. 334, 337 (2000) (citation omitted). The possibility of indignation and resentment is significant where officers use a forcible and destructive means to stop a vehicle without first giving its driver an opportunity to submit voluntarily to the officers' authority. *Cf. Hudson v. Michigan*, 547 U.S. 586, 594 (2006) (discussing the benefits of voluntary compliance and the avoidance of property destruction obtained through adherence to the knock-and-announce rule).

Other considerations, however, point towards relatively minimal intrusiveness. First, while Appellants' claim that the use of a spike strip without prior warning is "the vehicular equivalent of shooting a suspect in the leg without first say-ing, 'Stop, police,' " the Supreme Court has rejected prior

attempts to equate the application of force to vehicles with its application to persons. *See Scott*, 550 U.S. at 382-83 (noting, in response to petitioner's argument that police car's "bumping" of his vehicle was an unconstitutional application of deadly force akin to shooting him, that such bumping "is, in fact, not much like a policeman's shooting a gun so as to hit a person" (quotation marks and citation omitted)).

Second, the record below amply supports the district court's conclusion that the use of the CTDD was safe. Based on his deployment of the device on thirty to thirty-five occasions and his observation of its deployment by others on sixty to seventy occasions, Battaglini testified that the device is designed to and does result in a gradual release of air from the tires, permitting a vehicle to travel approximately one half of a mile at highway speeds before complete deflation occurs. Battaglini knew of only one instance in which a driver lost control, and in that case the driver swerved to avoid the device. Battaglini also testified that the Border Patrol takes specific precautions in using the device. For example, it does not deploy the device in the vicinity of bridges, hills, curves in the roadway, or in metropolitan or other heavily trafficked areas, and multiple agents coordinate their efforts to keep other traffic out of the way of the device as the suspect vehicle approaches it.[6] Lastly, Battaglini testified that on the day in question, traffic was very light, the device was deployed along a straight section of desert road with no nearby hazards, and two Border Patrol vehicles, including Battaglini's, were

---

[6]Appellants' reliance on the facts of *Bublitz v. Cottey*, 327 F.3d 485 (7th Cir. 2003), is misplaced. In *Bublitz,* a suspect ran over a spike strip and swerved into traffic, striking a vehicle and killing two of its occupants. *Id.* at 487. *Bublitz* is easily distinguishable in that the officers there deployed the spike strip in a dense metropolitan area. Battaglini testified that the Border Patrol does not employ CTDDs in urban areas or where other potential hazards are present, and that other traffic is held back to avoid contact with the device and the suspect. Both precautions were taken in this case, and the evidence overwhelmingly suggests that the absence of injuries was anything but coincidental.

positioned to keep any other traffic from coming into contact with the spike strip.

To rebut the evidence of safety, Appellants focused in the district court on the contents of a training manual provided by the manufacturer of the Border Patrol's spike strips. The manual indicates that the strips are designed to "stop[ ] high-speed pursuits" and are thus for pursuit termination only. Appellants have failed to explain, however, why the guidance in the training manual should determine whether the device may be used safely in other situations—particularly in situations where its use poses inherently less danger than in a high-speed pursuit. Appellants appear to contend that the prescriptions of the Training Manual should supersede police judgment as to the proper selection of the means to meet a threat, but the Supreme Court has explained that "the choice among . . . reasonable alternatives remains with . . . governmental officials." *Sitz*, 496 U.S. at 453-54. It is therefore inappropriate to commit to the courts—much less to the authors of a training manual—the "decision as to which among reasonable alternative law enforcement techniques should be employed." *Id.* at 453.

Appellants also offered the declaration of Jack Smith, a use-of-force expert, in connection with a motion inviting the district court to reconsider its denial of the motions to suppress. Smith stated that "the record of using [controlled tire deflation devices] is replete with death and/or serious injury to citizens as well as law enforcement officers," and that "many" law enforcement agencies permit the use of such devices exclusively as a last-resort. These statements, however, were unsupported by any citation to specific facts or evidence. In addition, Smith's resume failed to disclose any basis in experience or expertise for his opinion that the use of spikes "to seize a vehicle only suspected of smuggling illegal narcotics and/or aliens is not reasonable." The district court found Smith's declaration unconvincing. Particularly given our limited role in reviewing the district court's findings of

fact, we agree that the Smith declaration does not materially affect the assessment of whether deployment of the CTDD was safe in this instance.

## C. Balancing

**[17]** In light of the apparent safety of deploying the tire deflation device and the lesser degree of intrusiveness associated with the use of force against vehicles rather than persons, we conclude that the government's strong interests in protecting the nation's territorial integrity and interdicting the flow of drugs alone tip the Fourth Amendment balance in the government's favor. There is, however, an additional and critically important reason why the government must prevail in this case. Battaglini "defends his actions by pointing to the paramount governmental interest in ensuring public safety, and [Appellants] nowhere suggest[ ] this was not the purpose motivating" Battaglini's decision to deploy the spike strip. *Scott*, 550 U.S. at 383. Thus, "in judging whether [Battaglini's] actions were reasonable, we must consider the risk of bodily harm that [his] actions posed to [Appellants] in light of the threat to the public that [Battaglini] was trying to eliminate." *Id.* As our analysis indicates, the extreme danger posed by the reactive conduct of smugglers confronted with a show of authority tips the Fourth Amendment balance even more sharply in the government's favor.

Appellants argue that principles underlying the knock-and-announce rule should be applied to the use of tire deflation devices to effect vehicle stops, and that such principles render the conduct at issue here unreasonable per se. The Supreme Court has articulated the principal virtues of the knock-and-announce rule as follows:

> One of th[e] interests is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident. Another interest is the protection of

> property. . . . The knock-and-announce rule gives
> individuals the opportunity to comply with the law
> and to avoid the destruction of property occasioned
> by a forcible entry. And thirdly, the knock-and-
> announce rule protects those elements of privacy and
> dignity that can be destroyed by a sudden entrance.
> It gives residents the opportunity to prepare them-
> selves for the entry of the police.

*Hudson*, 547 U.S. at 594 (citations and quotation marks omit-
ted). While these animating concerns are not inapplicable in
the context of vehicle stops, *see supra*, slip op. at 9456, we
previously have declined an identical invitation to superim-
pose the knock-and-announce framework on the already com-
plicated jurisprudence of vehicle searches and seizures.
*United States v. Garcia-Hernandez*, 284 F.3d 1135, 1140 (9th
Cir. 2002) (rejecting knock-and-announce challenge to use of
a CTDD by the Border Patrol). Faced for a second time with
a situation in which Border Patrol agents had compelling rea-
sons not to activate their lights and sirens before deploying a
CTDD, we decline the invitation once again and hold that the
use of the CTDD was reasonable.[7]

## IV.  *BRADY* DISCLOSURES

Appellant Guzman argues that the district court's refusal to
compel the government to produce the Border Patrol's written
policy on the use of CTDDs violated his due process rights.
A failure to disclose material exculpatory evidence constitutes
a violation of due process under *Brady*. *See United States v.
Bagley*, 473 U.S. 667, 674 (1985). Evidence is material if
there is a reasonable probability that its disclosure would have
affected the outcome of the proceedings. *Id.* at 674-75.

---

[7]In light of our conclusion that the seizure was reasonable, "[w]e . . .
have no occasion to consider whether exclusion of the evidence would
have been an appropriate remedy." *Alverez-Tejeda*, 491 F.3d at 1018 n.3
(citing *Hudson*, 547 U.S. at 602).

"[M]ere speculation about materials in the government's files [does not require] the district court . . . under *Brady* to make the materials available for [appellant's] inspection." *United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986). Rather, "unless [a] defendant is able to raise at least a colorable claim that the [withheld material] contained evidence favorable to [him] and material to his claim[,] . . . no constitutional error . . . will have been established." *United States v. Griffin*, 659 F.2d 932, 939 (9th Cir. 1981).

*Brady* claims are reviewed *de novo* if they are raised in the district court. *United States v. Holler*, 411 F.3d 1061, 1066 (9th Cir. 2005). If they are not raised below, *Brady* claims are reviewed only to determine if their denial would constitute plain error affecting the appellant's substantial rights. *See* Fed. R. Crim. P. 52(b). Guzman's *Brady* claim fails under either standard. First, the claim is speculative. Guzman requested the written policy in response to Battaglini's testimony that the Border Patrol deploys CTDDs only in the three instances noted above. When asked whether these guidelines were contained in any written policy, Battaglini replied that there was such a policy but that he was uncertain as to whether it contained the guidelines. Regardless, Battaglini testified consistently that the Border Patrol adheres to the recited standard. Indeed, the record reflects that Battaglini's supervisor questioned him as to whether deployment was warranted under that standard. Guzman has failed to identify any basis in the record for his suggestion that Battaglini's actions were inconsistent with a written policy.

**[18]** Second, even if Battaglini's actions were inconsistent with Border Patrol policy, the policy would not have been material to the district court's determination. While Guzman asserted vaguely that the Border Patrol's failure to follow its own regulations would "say[ ] something about what happened here," this theory of materiality is foreclosed by our case law. It is well-settled that the scope of the Fourth Amendment's protections is not to be measured by reference

to agency guidelines and other extra-constitutional matter. *See, e.g.*, *Virginia v. Moore*, 128 S.Ct. 1598, 1603, 1607 (2008) (noting that founding-era citizens likely "were skeptical of using the rules for search and seizure set by government actors as the index of reasonableness," and refusing to find arrest based on probable cause unreasonable, even if state law did prohibit arrest for offense at issue); *Whren v. United States*, 517 U.S. 806, 815 (1996) (noting that "police enforcement practices . . . vary from place to place and from time to time," and that the scope of the Fourth Amendment cannot "be made to turn up such trivialities"). Specifically, the government's violation of its own rules does not provide a basis for the suppression of evidence in a criminal action. *See, e.g.*, *United States v. Hinton*, 222 F.3d 664, 674 (9th Cir. 2000) ("[S]uppresion is not the appropriate remedy for failure to follow agency regulations."); *United States v. Ani*, 138 F.3d 390, 392 (9th Cir. 1998) ("[V]iolation of an agency regulation does not require suppression of evidence."); *United States v. Choate*, 619 F.2d 21, 23 (9th Cir. 1980) ("[One] may not in a criminal prosecution seek judicial enforcement of [an] agency regulation by means of the exclusionary rule."). Guzman thus had no entitlement to the Border Patrol policy under *Brady*.

## CONCLUSION

The stop of Appellants' vehicle was a valid seizure incident to a border search, and it was conducted in a reasonable, non-excessive manner. Guzman's *Brady* rights were not violated. Accordingly, the judgment of the district court is

**AFFIRMED**.