# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

v.

ANDREW PUTRA SAHANAJA,
       *Defendant-Appellant.*

No. 04-50504

D.C. No.
CR 03-1270 LGB

OPINION

Appeal from United States District Court
for the Central District of California
Lourdes G. Baird, District Judge, Presiding

Argued and Submitted
September 12, 2005—Pasadena, California

Filed December 8, 2005

Before: Susan P. Graber and William A. Fletcher,
Circuit Judges, and Jeremy Fogel,* District Judge.

Opinion by Judge Fogel

---

*The Honorable Jeremy Fogel, United States District Judge for the
Northern District of California, sitting by designation.

16065

**COUNSEL**

Marilyn E. Bednarski, Kaye, McLane & Bednarski, LLP, Pasadena, California, for the defendant-appellant.

Debra W. Yang, United States Attorney, Steven D. Clymer, Special Assistant United States Attorney, and Beong-Soo Kim, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

FOGEL, District Judge:

Andrew Sahanaja ("Sahanaja") appeals his conviction for importing gamma-butyrolactone ("GBL") in violation of 21 U.S.C. § 952(a) and possessing GBL in violation of 21 U.S.C. § 841(a)(1). The conviction followed a conditional guilty plea pursuant to which Sahanaja reserved his right to appeal the district court's denial of his motion to suppress evidence arising from a warrantless search of a package mailed to his residence from Canada. Sahanaja also appeals his sentence, claiming that the district court erroneously applied the United States Sentencing Commission Guidelines ("Sentencing Guidelines") as mandatory rather than advisory.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Because we conclude that the search of the package was lawful under the extended border search doctrine, we affirm the conviction. Pursuant to *United States v. Ameline*, 409 F.3d 1073, 1074 (9th Cir. 2005) (en banc), *United States v. Moreno-Hernandez*, 419 F.3d 906, 916 (9th Cir. 2005), *cert. denied*, ___ S.Ct. ___, 2005 WL 2922683 (2005), and *United States v. Sanders*, 421 F.3d 1044 (9th Cir. 2005), we vacate the sentence and remand to the district court for a new sentencing hearing.

**BACKGROUND**

On November 10, 2003, a letter carrier for the United States Postal Service ("USPS") attempted to deliver a package addressed to Harry Fox ("Fox") at 2378 Huntington Drive in Duarte, California. Because no one was at home to accept delivery of the package, the letter carrier left a notice at the residence, informing the addressee that he could pick up the package at the post office in Duarte. The letter carrier felt nauseated after handling the package, which appeared to con-

tain a liquid substance even though it was labeled as containing videos.

Later that day, Alejandra Oquendo ("Oquendo"), Sahanaja's girlfriend, also a resident of 2378 Huntington Drive, attempted to claim the package at the Duarte post office. Oquendo was told that she could not receive the package unopened because she was not the addressee and that, if she wanted to sign for the package on Fox's behalf, she would have to open it in the presence of postal employees. After Oquendo declined to sign for and open the package, it was placed in an isolated area of the post office.

On November 14, 2003, Sahanaja, who also was a resident of 2378 Huntington Drive, made a telephone call to the Duarte post office regarding the package. Sahanaja stated that he was Fox's friend, that he received mail for Fox at his Huntington Drive address, and that he delivered such mail to Fox. Upon being told that he needed identification from Fox to claim the package, Sahanaja stated that he was unable to provide such identification. Sahanaja also stated that he did not have a forwarding address for Fox and that, if he (Sahanaja) was unable to pick up the package himself, the package should be returned to its sender without delay. After being told that the return address was illegible, Sahanaja provided a return address in Canada. However, the package remained on the shelf at the Duarte post office.

On November 18, 2003, the United States Bureau of Immigration and Customs Enforcement ("ICE") received a call from the USPS concerning the package, which was suspected by the USPS to contain contraband. The unopened package was retrieved from the USPS on November 19, 2003, and delivered to the Customs and Border Protection Laboratory, where it was opened and its contents were examined by agents and technicians who were authorized to conduct searches of international packages pursuant to 19 U.S.C. § 482(a). The package was found to contain two one-gallon

plastic containers that were labeled "hair tonic," but that in fact contained GBL, a precursor and analogue to gamma-hydroxybutyrate ("GHB"), a Schedule I controlled substance.

On November 18 or 19, 2003, Sahanaja submitted to the Duarte post office the delivery notice that had been left at his residence on November 10, 2003, and requested re-delivery of the package on November 21, 2003. A controlled delivery of the package was made to Sahanaja at the residence on November 25, 2003. Sahanaja accepted the package and printed and signed his name on the back of the delivery notice. Minutes later, ICE agents executed a warrant to search Sahanaja's residence. Inside, they discovered approximately three kilograms of GHB, as well as large quantities of potassium hydroxide ("KOH"), a substance used to create GHB.

On December 16, 2003, a federal grand jury returned a four-count indictment against Sahanaja, charging him with (1) causing the importation of GBL, (2) possessing GBL with the intent to distribute, (3) possessing GHB with the intent to distribute, and (4) possessing GBL knowing or having reasonable cause to believe that it would be used to manufacture GHB, in violation of various sections of Title 21 of the United States Code. On May 28, 2004, Sahanaja moved to suppress evidence of the contents of the package and the items seized from his residence. The district court denied the motion in an oral ruling on June 29, 2004. On July 22, 2004, Sahanaja entered a conditional guilty plea to counts one and four of the indictment, reserving his right to appeal the denial of his motion to suppress evidence. During the plea colloquy, Sahanaja admitted that he knowingly imported and possessed 5.5 kilograms of GBL, that he knew or had reasonable cause to believe that those 5.5 kilograms of GBL would be used to manufacture GHB, that he had up to 27.0 kilograms of KOH in his residence, and that he had 3.0 kilograms of a mixture or substance containing a detectable amount of GHB in his residence.

On October 14, 2004, the district court sentenced Sahanaja to a term of forty-six months in prison and three years of supervised release, and it ordered him to pay a special assessment of $200. Upon the government's motion, counts two and three of the indictment were dismissed.

## STANDARD OF REVIEW

We review *de novo* a district court's determination that a warrantless search was a valid border search. *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir. 1985). We may correct an error that was not raised at trial if the alleged error satisfies the plain-error test. *United States v. Cotton*, 535 U.S. 625, 631 (2002).

## DISCUSSION

### I.  Conviction

Sahanaja moved to suppress evidence of the contents of the package on the grounds that the warrantless search and seizure of the package violated his Fourth Amendment rights and did not come within the recognized Fourth Amendment exception for border searches. He also moved to suppress evidence of the items found in his residence as "fruit of the poisonous tree" because the warrant used to search his residence was obtained in reliance upon the earlier search of the package. The government opposed Sahanaja's motion on two grounds: (1) that Sahanaja lacked standing to assert a violation of his Fourth Amendment rights as a result of his apparent relinquishment of any right to the package when he instructed the post office to return the package to its sender and (2) that the search of the package by Customs agents was legal under the agents' broad authority to search international mail after it has arrived in the United States if there is reasonable cause to suspect criminal activity.

Although the district court rejected the government's standing argument, finding that Sahanaja had a reasonable expecta-

tion of privacy in the package and that he had not relinquished that expectation as of the time of the search, it determined that the search was carried out at the functional equivalent of the border and thus was lawful. We agree with the district court's determination that Sahanaja had standing to bring his suppression motion. Because we also conclude that the motion was properly denied on the merits, we need not discuss that issue here.

[1] Two different statutes—19 U.S.C. §§ 482 and 1582—authorize Customs searches of packages arriving at the border from a foreign country. We considered the differences between these two statutes more than a decade ago, noting that:

> Section 1582 . . . deals with customs searches *at the border*, while section 482 deals with searches of items "*wherever found*," in which agents suspect there is contraband or dutiable goods that "[were]" already imported illegally. Section 1582, with no suspicion requirement, is applicable to searches of incoming international mail—searches which are effectively carried out at the border. In contrast, there is good reason to require, as does section 482, reasonable cause to search packages discovered far from the border. Properly read, the two sections preserve the important distinction between customs searches at the border and other customs searches.

*United States v. Taghizadeh*, 41 F.3d 1263, 1265 (9th Cir. 1994) (en banc) (footnotes omitted, alterations in original).

[2] In *United States v. Ramsey*, 431 U.S. 606, 612-13 (1977), the United States Supreme Court held that "[t]he 'reasonable cause to suspect' test adopted by [§482] is . . . a practical test which imposes a less stringent requirement than that of 'probable cause' imposed by the Fourth Amendment as a requirement for the issuance of warrants." The Court held that

the Customs official who performed the search of incoming international mail in that case had reasonable cause to suspect that there was merchandise or contraband in the envelopes because he knew, at the time he opened the envelopes, that they "were from Thailand, were bulky, were many times the weight of a normal airmail letter, and 'felt like there was something in there.' " *Id*. at 614. Given these facts, the Court concluded that the search was "plainly authorized" by Section 482. *Id*. at 615. It then proceeded to determine whether the search "nevertheless violated the Constitution." *Id*. In so doing, it noted that

> [a]lthough the statutory authority authorizes searches of envelopes "wherever found," 19 U.S.C. § 482, the envelopes were searched at the New York City Post Office as the mail was entering the United States. We, therefore, do not have before us the question, recently addressed in other contexts, of the geographical limits to border searches. Nor do we need to decide whether the broad statutory authority subjects such mail to customs inspection at a place other than the point of entry into this country.

*Id*. at 615 n.11 (citation omitted).

**[3]** Although *Ramsey* thus did not explore the constitutionality of searches pursuant to § 482 at places "other than the point of entry into this country," *id*., we previously have had occasion to consider this issue in the context of an "extended border search" similar to the search at issue here. In *United States v. Cardona*, 769 F.2d at 627 (9th Cir. 1985), a Customs agent searched a package that was to be sent from California to Colombia on behalf of an individual who was suspected of being involved in a Colombian drug organization. *Id*. at 627. The package was searched in California, three thousand miles from its intended border exit point, shortly after having been given to Federal Express for delivery and twenty-four hours

before the scheduled border crossing. *Id.* at 627-28. We observed that

> [a] border search need not take place at the actual border. Because of the nature of international travel and transportation, courts have held that border searches may be conducted at places considered the "functional equivalent" of a border. In addition, the "extended border search" doctrine has been applied to entry border searches conducted some time after the border was crossed.

*Id.* at 628 (citations omitted). While recognizing the "difficulty of making sharp distinctions between searches at the functional equivalent of the border and extended border searches," we went on to explain that, "[s]ince an extended border search involves a greater spatial and temporal distance from the border than a search at the functional equivalent of the border, it must be justified by a 'reasonable suspicion' of criminal activity." *Id.* This requirement that there be a " 'reasonable suspicion' of criminal activity" for an extended border search echoes § 482's requirement of "reasonable cause to suspect."

In light of the "distance and time factors" presented in *Cardona*, we assessed the constitutionality of the search under the extended border search doctrine articulated in *Alexander v. United States,* 362 F.2d 379, 382 (9th Cir. 1966):[1]

---

[1]Discussing the constitutional boundaries of § 482 and 19 U.S.C. § 1581, which grants Customs officials the authority to board vessels and vehicles, we explained in *Alexander* that,

> In conferring upon Customs officers such broad authority, circumscribed only by Constitutional limitations of the Fourth Amendment, the Congress has in effect declared that a search which would be "unreasonable" within the meaning of the Fourth Amendment, if conducted by police officers in the ordinary case, *would be a reasonable search if conducted by Customs officials*

> Where . . . a search for contraband by Customs offi-
> cers is not made at or in the immediate vicinity of
> the point of international border crossing, the legality
> of the search must be tested by a determination
> whether the totality of the surrounding circum-
> stances, including the time and distance elapsed as
> well as the manner and extent of surveillance, are
> such as to convince the fact finder with reasonable
> certainty that any contraband which might be found
> in or on the vehicle at the time of search was aboard
> the vehicle at the time of entry into the jurisdiction
> of the United States. Any search by Customs offi-
> cials which meets this test is properly called a "bor-
> der search".

Based on the totality of the circumstances, we found the
search of the Federal Express package to be a "valid extended
border search," because it was "supported by reasonable sus-
picion of criminal activity" and because, "[w]hen the parcel
was placed in the custody of Federal Express agents, it was
all but certain that the parcel's condition would remain
unchanged until it crossed the United States border."[2] *Car-
dona*, 769 F.2d at 629.

---

*in lawful pursuit of unlawful imports*. Judicial recognition of this
distinction has given rise to the term "border search", in order to
distinguish official searches which are reasonable because made
solely in the enforcement of Customs laws from other official
searches made in connection with general law enforcement.
Validity for this distinction is found in the fact that the primordial
purpose of a search by Customs officers is not to apprehend per-
sons, but to seize contraband property unlawfully imported or
brought into the United States.

362 F.2d at 381-82 (emphasis added).

[2]Although *Cardona* involved the search of a package about to *leave* the
United States, rather than one that recently had arrived, we observed that
there is "no principled basis" to apply the extended border search doctrine
differently with respect to exit and entry searches. *Cardona*, 769 F.2d at
629.

**[4]** Applying these authorities to the facts presented here, we conclude that ICE agents conducted a valid extended border search pursuant to their authority under Section 482 and did not violate Sahanaja's Fourth Amendment rights. Given (1) the discrepancy between the label on the package and what the postal carrier could discern about its contents from handling it, (2) the odor coming from the package, (3) the fact that people who handled the package became nauseated, (4) Oquendo's declination to open the package in the presence of postal employees, and (5) multiple inquiries about the package by people who were not the addressee and who could not produce identification from the addressee, there was reasonable cause to suspect that the package contained "merchandise which was imported contrary to law." 19 U.S.C. § 482. It also was evident that the contraband found in the package at the time of the search was in the package at the time the package entered the jurisdiction of the United States. The testimony presented to the district court established that the package was kept in an isolated area of the Duarte post office from the time of its return to the post office following the failed delivery attempt on November 10, 2003, until ICE agents retrieved it from the post office for the purpose of searching it nine days later. There was no evidence that the package was altered or tampered with at any other time.

Sahanaja argues that, even under *Cardona*, the search of a package that had been under the exclusive control of an inland post office for nine days following its physical entry into the United States cannot reasonably be characterized as a border search, extended or otherwise. We disagree. *Cardona* and the authorities upon which it relies apply a "totality of the circumstances" test in determining whether a search pursuant to § 482 is constitutional. *Id.* at 629. In this case, the package remained unopened, in its original condition, and never left official custody at any time before the search; it is immaterial whether it sat on a shelf in a Customs office or in a post office. Under these circumstances, it is difficult to see how the mere passage of a short period of time—even when consid-

ered together with the fact that Duarte is some distance from the border—is a factor of constitutional significance.

Sahanaja also argues that, because ICE was not involved in the case initially, the search of the package could not have been authorized by § 482. Instead, he characterizes the search as one essentially conducted at the behest and direction of the USPS—which concededly would have had to obtain a warrant to conduct the search itself—through an improper "hand off" to ICE officials for the purpose of circumventing the Fourth Amendment. The record simply does not support this argument. Although it is undisputed that ICE learned about the package and its suspicious nature from USPS employees, ICE officials were entitled to make, and presumably did make, their own assessment as to whether there was reasonable cause to suspect that the package contained contraband and then to conduct the search pursuant to their own statutory authority. *See United States v. Alfonso*, 759 F.2d 728, 735 (9th Cir. 1985) (rejecting argument that participation in search by persons who were not Customs agents nullified classification of search as border search and holding that "[i]t is sufficient that the search be executed under the authority and direction of those agencies having jurisdiction in safeguarding the borders").[3] *United States v. Soto-Soto*, 598 F.2d 545 (9th Cir. 1979), on which Sahanaja relies, is distinguishable. In that case, the record established that an agent of the Federal Bureau of Investigation conducted the search "as part of a general law enforcement effort" and "was not working in cooperation with customs agents." *Id.*, at 550.

---

[3]In *Alfonso*, we found that there was a "planned, coordinated execution of an official inspection and search upon entry into the country" led by the Customs Service with the assistance of other federal and local law enforcement agencies. We held that "there is no reason why the limited forces of the Customs Service, Border Patrol, Immigration officers, and similarly designated officials cannot enlist the aid of other forces in forming a task force sufficient to meet their needs." *Alfonso*, 759 F.2d at 735. Although the USPS was not expressly enlisted by ICE as part of a task force for the purpose of the search in this case, the rationale of *Alfonso* appears to be equally applicable here.

**[5]** Because we conclude that ICE agents conducted a valid extended border search of the package at issue pursuant to their authority under § 482 and did not violate Sahanaja's Fourth Amendment rights in so doing, we affirm the district court's denial of Sahanaja's motion to suppress evidence.

## II.   Sentence

Sahanaja also contends that his sentence must be vacated because the district court committed plain error in applying the Sentencing Guidelines as mandatory and that the case should be remanded to the district court for re-sentencing. In *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc) ("*Ameline III*"), we addressed a question left unresolved by the United States Supreme Court's decision several months earlier in *United States v. Booker*, ___ U.S. ___, 125 S. Ct. 738 (2005), which "struck down the sentencing scheme created by the Sentencing Reform Act of 1984 to the extent that the Act mandated the imposition of sentences predicated on facts not found by the jury or admitted by the defendant" and "severed the mandatory portions of the Act, rendering its sentencing provisions, including the Sentencing Guidelines, effectively advisory." *Ameline III*, 409 F.3d at 1074. Specifically, we addressed the question, for cases pending on direct review, of "what relief, if any, is to be afforded to a defendant who did not raise a Sixth Amendment challenge prior to sentencing." *Id*. We held that

> when we are faced with an unpreserved *Booker* error that may have affected a defendant's substantial rights, and the record is insufficiently clear to conduct a complete plain error analysis,[4 ] a limited

---

[4]Under the plain-error test, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (internal quotation marks omitted) (alteration in original). If these three conditions are met, the appellate court "may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id*. (alteration in original).

> remand to the district court is appropriate for the purpose of ascertaining whether the sentence imposed would have been materially different had the district court known that the sentencing guidelines were advisory.

*Id*. The limited-remand procedure should be used "only when it cannot be determined from the record whether the judge would have imposed a materially different sentence had he known that the Guidelines are advisory rather than mandatory." *Id*. at 1083. If, on remand, the district court responds in the affirmative (i.e., that the sentence imposed would have been materially different), then the district court should vacate the original sentence and re-sentence the defendant. *Id*. at 1074. If, on the other hand, the district court responds in the negative (i.e., that the sentence imposed would not have been materially different), then the original sentence will stand, subject to appellate review for reasonableness. *Id*. at 1074-75. During the limited remand, we do not retain jurisdiction. *Id*. at 1080.

Two-and-a-half months later, in *United States v. Moreno-Hernandez*, 419 F.3d 906 (9th Cir.), *cert. denied*, ___ S.Ct. ___, 2005 WL 2922683 (2005), we observed that, in *Ameline III*, "the defendant had asserted the Sixth Amendment objection that his 'sentence was enhanced by judge-found facts under a mandatory Guidelines system'" but "neither party had raised the 'nonconstitutional error that a sentence was erroneously imposed under guidelines believed to be mandatory.'" *Id.* at 915 (quoting *Ameline III*, 409 F.3d at 1084 & n.8). In contrast, in *Moreno-Hernandez* we were faced with a situation in which the district court had *not* committed a Sixth Amendment error, and it had to decide "whether to follow *Ameline*'s 'limited remand' approach where the only error involved is of the nonconstitutional variety." *Id*., at 216. Finding that nothing in the *Ameline III* opinion "indicates that the en banc court intended to utilize that approach only in cases of Sixth Amendment error" and perceiving no reason why

*Ameline III* should be so limited, we held in *Moreno-Hernandez* that "defendants are entitled to limited remands in *all* pending direct criminal appeals involving unpreserved *Booker* error, whether constitutional or nonconstitutional." *Id.*

Sahanaja has waived his right to assert a Sixth Amendment *Booker* challenge to his sentence because he stipulated that the district court, rather than a jury, would determine sentencing enhancements beyond a reasonable doubt. His *Booker* challenge thus is of the nonconstitutional variety—that is, a claim that the only *Booker* error was the district court's imposition of a sentence under guidelines it erroneously believed to be mandatory. The parties agree that Sahanaja did not challenge the application of the Sentencing Guidelines as mandatory before the district court and thus did not preserve the *Booker* error. Accordingly, the instant case is controlled by *Moreno-Hernandez*.

**[6]** A limited remand to the district court under *Moreno-Hernandez*, applying *Ameline III*, ordinarily would be appropriate here because it cannot be determined from the record whether the district court judge would have imposed a materially different sentence had she known that the Sentencing Guidelines were advisory rather than mandatory. At the sentencing hearing on October 14, 2004, the district court indicated that it was constrained by the Sentencing Guidelines, stating that "[w]e are under the law and I have to follow the law and guidelines." After observing that "[i]t does seem to me that 46 to 57 months is pretty high," the district court sentenced Sahanaja to "46 months, which is the low end." When asked about giving an alternative sentence in the event that the Sentencing Guidelines were found to be unconstitutional, the district court declined to do so, explaining,

> Generally, I do give alternative sentences if the entire guidelines schematic is found unconstitutional. I guess I have been so involved in crunching numbers and KOH and GHB that I haven't really thought

about what would be appropriate punishment in this case. I was doing this, considered it to some extent but the guidelines do constrain one dramatically.

In a minute order issued the following day, the district court formally denied the government's request for an alternative sentence, stating, "[i]n the event that indeterminate sentencing is reinstated, the Court will consider it at that time."

**[7]** However, a limited remand is not possible in this case because the district judge who sentenced Sahanaja has retired. Under these circumstances, "the original sentence should be vacated and the case remanded for a full resentencing hearing." *Sanders*, 421 F.3d at 1052 (9th Cir. 2005). We so order.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**