**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellant,*

v.

JOSE ALBERTO VILLASENOR,
      *Defendant-Appellee.*

No. 08-50541

D.C. No.
3:08-CR-02205-H-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

Argued and Submitted
November 4, 2009—Pasadena, California

Filed June 10, 2010

Before: Thomas G. Nelson, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Bybee

## COUNSEL

Lawrence E. Spong (argued), Assistant United States Attorney, Criminal Division, San Diego, California; Luella M. Caldito, Assistant United States Attorney, Criminal Division, San Diego, California, for the plaintiff-appellant.

Gary P. Burcham, Burcham & Zugman, APC, San Diego, California, for the defendant-appellee.

**OPINION**

BYBEE, Circuit Judge:

We must decide whether a search conducted after a border crossing qualifies as a reasonable search under the extended border search doctrine. The district court granted the defendant's motion to suppress, ruling that the unusual factual scenario presented here did not fit within the rubric of the extended border search doctrine. We review the question of reasonable suspicion *de novo*, *Ornelas v. United States*, 517 U.S. 690, 699 (1996), and review the district court's findings of fact for clear error, *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). On appeal, the government argues that we have recognized similar extended border searches as reasonable. We agree with the government and reverse the judgment of the district court.

I

On June 17, 2008, Immigration and Customs Enforcement ("ICE") Agent Enrique Torregrosa helped ICE Agent Chad Worgen interview a person caught smuggling drugs through the Calexico West Port of Entry in Southern California. During their conversation, the smuggler admitted to being involved in a larger drug trafficking organization. He told the agents that in the near future he was to meet up with a white Toyota Tacoma, which would serve as a "load vehicle," and a white PT Cruiser, which would serve as a "scout vehicle." He was supposed to meet the cars on the California side of the border at either PepBoys or McDonald's, at which point he would be led to a separate drop-off location. The smuggler did more than just talk: he showed the agents a picture of the PT Cruiser on his cell phone, from which Agent Worgen was able to decipher a license plate number, 6CHU366. Agent Worgen later entered the license plate number in the Treasury Enforcement Communications System ("TECS"), a computer-based information system designed to identify individuals

crossing the border who are suspected of violating federal law.

At some point the following morning, eighty-two year old Jose Villasenor drove a white PT Cruiser up to the Calexico West Port of Entry. The car's license plate, 6CHU366 (matching the one in the photo on the smuggler's cell phone), triggered an automatic referral to secondary inspection, where a narcotics detecting dog ("NDD") sniffed the car but failed to alert.[1]

At 9:10 that morning, Agent Torregrosa was driving southbound on Imperial Avenue hoping to park at the Port of Entry. When he saw there was no parking available, he made a U-turn, and began heading north on Imperial. While stopped at a red light at Imperial and Second Avenue, Torregrosa suddenly realized that he had pulled up right behind a white PT Cruiser. Although he had not seen the car cross the border, he quickly deduced that it must have come from the Port of Entry.[2] After calling and confirming that Agent Worgen had entered the car's license plate number in TECS, Torregrosa decided to follow Villasenor.

Villasenor stopped at the next block at a FillCo gas station. He got out, talking on his cell phone, and walked to the corner of the gas station while looking south toward the Port of Entry. After two or three minutes on the corner, Villasenor turned around and went into the gas station's restroom. Shortly thereafter, he got in his car and left the gas station, never having filled up. All together, he was at the FillCo for approximately ten minutes and was talking on his cell phone the entire time.

---

[1]The dog was later "fired."

[2]The only other possibility, which Torregrosa discounted because he had not noticed the PT Cruiser in front of him, was that Villasenor had also made a U-turn on Imperial.

Next, Villasenor went to an AM/PM gas station, about two miles from the FillCo. He got out, still on his cell phone, and walked around the Cruiser. Less than five minutes later, again without filling up, he got in his car and left. Villasenor then went to the DMV, about thirty minutes away. Villasenor exited his car and walked into the DMV.[3] He returned to his car two or three minutes later.

While surveilling Villasenor at the DMV, Torregrosa asked the local police department—the El Centro Police Department —to send a marked police car to conduct a traffic stop of Villasenor's car.[4] Sergeant John Seaman responded to the call, tailing Villasenor's car just as it was leaving the DMV. Before long, Seaman noticed a ten-inch rosary hanging from Villasenor's rearview mirror. Relying on California Vehicle Code § 26708(a)(2), which prohibits "driv[ing] any motor vehicle with any object placed in or upon the vehicle that obstructs or reduces the driver's clear view through the windshield," Seaman stopped Villasenor.

Upon arriving at the scene a few minutes later, Torregrosa called an NDD officer to conduct a sniff of the car. Seaman, meanwhile, ticketed Villasenor for his failure to provide proof of insurance. Upon receiving the ticket, Villasenor asked if he could leave, but was told he would have to wait. Forty-five minutes later Agent Biella arrived with an NDD. At that point, Biella told Torregrosa that Villasenor's car had gone through secondary inspection that morning. During the ensuing dog sniff, the NDD alerted to the rear rocker panel. The agents looked behind the panel and discovered 15 packages of cocaine weighing a total of 37.36 pounds. Villasenor was indicted for importing and possessing an illegal substance under 21 U.S.C. §§ 952 and 960.

---

[3]Agent Torregrosa briefly lost sight of Villasenor as he turned the corner to enter the DMV.

[4]Torregrosa said that he requested the traffic stop to avoid getting "burned," i.e., to avoid having his car recognized as a vehicle involved in drug interdiction.

The district court granted Villasenor's motion to suppress the drug evidence. The court agreed with Villasenor that Agent Torregrosa did not have reasonable suspicion "that there was contraband in the vehicle." The court also rejected the government's contention that the detention and subsequent dog sniff of Villasenor's vehicle was a valid "extended border search." The court reasoned that Villasenor's behavior after crossing the border was not "terribly suspicious," and that "there was already a search of the vehicle" at the border. The government timely appeals.

## II

The Fourth Amendment protects "against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Generally, "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) (quotation marks and citation omitted). As a result, most border searches need not be justified by a search warrant or by any level of individualized suspicion. *United States v. Abbouchi*, 502 F.3d 850, 855 (9th Cir. 2007).

Border searches do not always occur at the physical border. *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir. 1985). On account of the "practical difficulty of getting to and searching every vehicle or carrier at the precise moment it crosses land or sea borders," *id.*, border searches sometimes occur "at the functional equivalent of a border," *United States v. Guzman-Padilla*, 573 F.3d 865, 877 (9th Cir. 2009) (quotation marks omitted); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (citing "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City" as an example of "the functional equivalent of a border search").

A distinct but closely related type of border search is the so called extended border search. Extended border searches usually occur near the border but after the border has already been crossed. *See Alfonso*, 759 F.2d at 734. Because extended border searches "intrude more on an individual's normal expectation of privacy," *id.*, their reasonableness depends on two factors: (1) "whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, . . . convince the fact finder with reasonable certainty that any contraband . . . in or on the vehicle at the time of search was aboard the vehicle at the time of entry into the . . . United States," *United States v. Sahanaja*, 430 F.3d 1049, 1054 (9th Cir. 2005); and (2) whether government agents conducting the search have "reasonable suspicion that the search may uncover contraband or evidence of criminal activity." *Abbouchi*, 502 F.3d at 855; *see Guzman-Padilla*, 573 F.3d at 878-79 (noting that "an extended border search is 'any search away from the border where entry is not apparent,' but where the dual requirements of reasonable certainty of a recent border crossing and reasonable suspicion of criminal activity are satisfied" (citations omitted)). As with border searches generally, "the major impetus behind the extended border search doctrine is the government interest in stopping drug traffic." *United States v. Yang*, 286 F.3d 940, 946 (7th Cir. 2002) (quotation marks omitted).

On appeal, the government argues that the forty-five minute stop of Villasenor to wait for an NDD and its officer qualifies as a reasonable extended border search. With respect to the first factor, the government argues that because of Agent Torregrosa's virtually constant surveillance of Villasenor after he crossed the border, there is reasonable certainty that the 15 packages of cocaine were in Villasenor's car when he crossed the border. As to the second factor, the government contends that, viewed as a whole, the smuggler's tip and Villasenor's unusual behavior after crossing the border provided Torre-

grosa with reasonable suspicion that a search of Villasenor's car would turn up evidence of drug-related activity.

Villasenor does not contest that there was reasonable certainty that the drugs were in his car when he crossed the border. Instead, he argues, pointing to the "intensive secondary inspection . . . involving a narcotic-detector dog" at the border, that "there was simply no evidence" that Villasenor was involved in some kind of criminal activity. The district court agreed with Villasenor. The court thought—based primarily on the failed dog sniff at the border—that Torregrosa did not have reasonable suspicion that Villasenor's car contained contraband. In addition, it found that Villasenor's behavior after crossing the border was "not terribly suspicious." Accordingly, the court held that the search "did not meet the qualifications for an extended border search."

## III

Although we think that there is some force to Villasenor's arguments and to the district court's holding, we are persuaded that the search of Villasenor's car was reasonable under the Fourth Amendment as an extended border search. Because Villasenor does not contest that the cocaine was in his car at the time he crossed the border, we focus our discussion on the second prong of the extended border search analysis: whether Torregrosa had reasonable suspicion to believe that a search of Villasenor's car would turn up evidence of criminal activity.[5]

---

[5]We do not discuss the validity of the rosary-based traffic stop. As is explained in more detail below, because Agent Torregrosa requested that the El Centro Police Department conduct a traffic stop of Villasenor's car, we may impute Torregrosa's knowledge of the tip and Villasenor's unusual behavior to Sergeant Seaman under the collective knowledge doctrine. *United States v. Ramirez*, 473 F.3d 1026, 1031-32 (9th Cir. 2007). Thus, whether Seaman had probable cause to believe that the rosary hanging from Villasenor's rearview mirror "obstruct[ed] or reduce[d Villasen-

## A

**[1]** The Fourth Amendment generally requires that police officers have probable cause before searching a car. *See United States v. Ross*, 456 U.S. 798, 807-08 (1982). Under the extended border search doctrine, however, agents may conduct a search armed only "with reasonable suspicion that the search may uncover contraband or evidence of criminal activity." *Abbouchi*, 502 F.3d at 855; *see Guzman-Padilla*, 573 F.3d at 877-78 (explaining that an extended border search requires " 'reasonable suspicion' that the subject of the search was involved in criminal activity" (citations omitted)).

**[2]** Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particu-*

---

or's] clear view through the windshield," *see* Cal. Veh. Code § 26708(a)(2), is ultimately beside the point, *see Ramirez*, 473 F.3d at 1031 ("[I]t does not matter that [Sergeant Seaman] was directed to make a 'traffic stop,' nor does it matter whether he had valid grounds to make the traffic stop because of [a hanging rosary]. If [Agent Torregrosa] had [reasonable suspicion], then the seizure and search of the vehicle [was] justified."); *see also id.* at 1037 (Kozinski, J., concurring) ("This is not a case where the investigating officers ordered a fellow officer to conduct a traffic stop because *they* lacked probable cause for a narcotics stop. . . . [T]hat the arresting officer made it look like a 'traffic stop' . . . did not change the nature of the stop, which remained—in substance—a narcotics stop." (emphasis added)).

Even if Seaman had probable cause to stop Villasenor, there is no question, on this record, that the forty-five minute detention lasted much longer than a traditional traffic stop, especially one for such a minor infraction. *See Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) ("[D]etention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes."). And if Seaman did not have probable cause, the constitutional legitimacy of the stop still turns on whether *Torregrosa* had reasonable suspicion that Villasenor was involved in criminal activity, thereby justifying the length of the stop under the extended border search doctrine. As a result, resolution of the issue of the hanging rosary is irrelevant to the question before us.

*larized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). Although an officer may not base his reasonable suspicion on a "hunch," *United States v. Sokolow*, 490 U.S. 1, 7 (1989), he may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available . . . that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). In reviewing whether reasonable suspicion was present, we consider the evidence as a whole, not piece by piece. *United States v. Cortez*, 449 U.S. 411, 417 (1981).

[3] Viewed together, the smuggler's tip and Villasenor's unusual behavior after crossing the border were enough to provide Torregrosa with reasonable suspicion that a search of Villasenor's car would uncover evidence that Villasenor was involved in criminal activity.[6] In assessing whether the tip contributed to Torregrosa's reasonable suspicion, we "employ a totality-of-the-circumstances approach that takes into consideration the informant's veracity or reliability and his basis of knowledge." *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (internal quotation marks omitted). On the whole, we think the smuggler's tip was reliable. For one thing, the smuggler was not an anonymous tipster; he spoke with the officers face to face. *See id.* at 908; *United States v. Palos-Marquez*, 591 F.3d 1272, 1275-76 (9th Cir. 2010). For another, by admitting his involvement in a larger drug trafficking operation, the smuggler may have invited more severe criminal penalties. *Cf. Adams v. Williams*, 407 U.S. 143,

---

[6]We recognize that under the Supreme Court's decision in *Illinois v. Caballes*, a dog sniff is not a "search." 543 U.S. 405, 409 (2005). But as that decision made clear, a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Id.* at 407. In our view, therefore, the critical question is whether Torregrosa possessed the constitutional authority to search Villasenor's car. If he did, waiting forty-five minutes for an NDD was reasonable. If he did not, the stop was probably too long.

146-47 (1972) (noting that one of the indicia of reliability is that the informant could be subject to criminal penalties for lying to the police). The smuggler had "first-hand knowledge" concerning cars that would be involved and potential rendezvous sites. *Palos-Marquez*, 591 F.3d at 1277. Most importantly, he provided the agents with a photo and the license plate number of the car to be driven by one of his accomplices. When a car with that same license plate number crossed the border the very next day, Torregrosa could be reasonably confident that the smuggler "ha[d] knowledge of concealed criminal activity." *Florida v. J.L.*, 529 U.S. 266, 272 (2000).

**[4]** To be sure, not everything about the tip played out exactly as the smuggler described it. For instance, the smuggler's prediction that the white PT Cruiser would meet up with a white Toyota Tacoma at either McDonald's or Pep-Boys proved to be inaccurate. Although a tipster's failure to accurately predict an accused's future movement often undermines his credibility, we do not think that is the case here. Because the smuggler was describing future events in which he was involved, his arrest may have substantially affected the likelihood that the predicted activities would occur. One possibility, for example, is that the arranged meeting was cancelled when Villasenor and his conspirators were unable to contact the smuggler after his arrest. In any event, under these circumstances, the fact that the meeting did not occur does not significantly undercut the tip's other indicia of reliability. *See Alabama v. White*, 496 U.S. 325, 331 (1990) (finding reasonable suspicion despite the fact "that not every detail mentioned by the tipster was verified").

**[5]** To Torregrosa's trained eye, Villasenor's behavior after crossing the border aroused further suspicion. Villasenor first stopped at a FillCo, which, according to Torregrosa, was a regular site of vehicle-swapping, drug-swapping, and other drug-related activity. Villasenor got out and walked over to the corner of the lot, looking back toward the port of entry as

if he was expecting someone, talking on his cell phone all the while. After using the restroom, he got back in his vehicle and left. He did not fill up when he next drove to AM/PM, another gas station that was, according to Torregrosa, associated with drug-related activity. Villasenor then went to the DMV, about thirty minutes away; he did not appear to have any lawful business there either. Each of Villasenor's moves, on its own, might have an innocent explanation. But "[a] determination that reasonable suspicion exists [ ] need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Overall, Villasenor's behavior, combined with the smuggler's tip, provided Torregrosa with reason to believe that a search of Villasenor's car would uncover evidence of criminal activity. Under the extended border search doctrine, that was all he needed to search Villasenor's vehicle. *See Guzman-Padilla*, 573 F.3d at 877-78*; Abbouchi*, 502 F.3d at 855.

## B

Villasenor contests this conclusion on two principal grounds. First, he argues that the detention and sniff of Villasenor's car cannot qualify as an extended border search because Torregrosa did not have reasonable suspicion that the car contained drugs. Second, he argues that the extended border search doctrine does not apply in cases where an "intensive secondary inspection" takes place at the border, including a dog sniff. Both arguments are foreclosed by our precedent.

## 1

In arguing that Torregrosa did not have reasonable suspicion that Villasenor's car contained drugs, Villasenor emphasizes that Torregrosa knew, or at least should have known, that a dog sniffed Villasenor's car at the border but failed to alert. With that knowledge, Villasenor maintains, Torregrosa could not have reasonably believed that Villasenor's car contained drugs. There are two problems with Villasenor's argument, one factual and one legal.

**[6]** As to facts, there is no indication that Torregrosa knew that Villasenor's car had been sniffed at the border. Indeed, Torregrosa testified that he did not know the car had been sent to secondary. It is true that Torregrosa knew, prior to stopping Villasenor, that Agent Worgen had entered Villasenor's license plate number in TECS. It is also true that he knew that a hit on TECS should trigger an "automatic referral to secondary," including a dog sniff. But all that suggests is that Torregrosa *should have known* that Villasenor's car *should have been sent* to secondary inspection.

Villasenor argues that we need not concern ourselves with whether Torregrosa actually knew or should have known the car had been sniffed, because we may impute knowledge of the failed dog sniff to Torregrosa under the collective knowledge doctrine. That doctrine allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest. It generally applies in two situations. The first is "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007). The second occurs "where an officer . . . with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion . . . directs or requests that another officer . . . conduct a stop, search or arrest." *Id.* at 1033. In both situations, collective knowledge may be imputed only if there has been some "communication among agents." *Id.* at 1032. According to Villasenor, because there is a "close working relationship" between ICE agents and inspectors of Customs and Border Protection ("CBP"), we may impute the CBP Inspectors' knowledge of the failed dog sniff to Agent Torregrosa. We are unpersuaded.

**[7]** The first situation in which the collective knowledge doctrine is invoked does not apply here. Although CBP agents and ICE agents have a "close working relationship," there is no evidence in the record that CBP agents and Agent Torre-

grosa were "working together in an investigation." *Ramirez*, 473 F.3d at 1032. Moreover, even if we assume that the agents were working together in an investigation, "the cases suggest a limited requirement that there be a communication . . . among officers." *Id.* at 1032-33. The record is devoid of any communication between CBP agents and Torregrosa regarding Villasenor.[7] The second situation does not apply because there is no evidence in the record that CBP agents "direct[ed] or request[ed] that [Torregrosa] conduct a stop, search or arrest." *Id.* at 1032. Just as we would not permit the government to comb its collective files to establish probable cause or reasonable suspicion, we decline to indulge Villasenor's effort to assemble everything known by agents working on the border in an effort to show that Torregrosa knew too much. *Cf. Savino v. New York*, 331 F.3d 63, 74 (2d Cir. 2003) (reiterating that court's holding that the collective knowledge doctrine "*cannot* be used to impute to an officer facts . . . which exonerate an arrestee") (internal quotation marks omitted).

[8] As to law, as we explained above, an extended border search is proper as long as the searching agent possesses "suspicion that the search may uncover contraband *or evidence of criminal activity*." *Abbouchi*, 502 U.S. at 855 (emphasis added). Thus, even if Torregrosa did not suspect that Villasenor himself was carrying drugs, he still had reasonable suspicion, based on specific, articulable facts, that a search of Villasenor's car would uncover other evidence of drug-related activity; indeed, Torregrosa had strong evidence to suspect that Villasenor was involved in drug-smuggling. That evidence included: a tip from an apprehended smuggler that Villasenor's car was to serve as the scout vehicle in an illegal

---

[7]We recognize that Officer Biella, a CBP agent, told Torregrosa that Villasenor had gone through secondary inspection *after* Villasenor had been stopped and held for forty-five minutes. That, of course, does not affect our conclusion that CBP agents' knowledge may not be imputed to Torregrosa *before* he stopped and held Villasenor.

drug operation; Villasenor's unusual behavior at two gas sta-
tions located a mile and a half apart and known for their asso-
ciation with drug-related activity; and Villasenor's seemingly
purposeless visit to the DMV. Though far from conclusive,
the totality of the circumstances suggests that Torregrosa had
enough, under the extended border search doctrine, to search
Villasenor's car. *See Yang*, 286 F.3d at 949 (citing "unusual
conduct," "tips from informants," and "information from [an]
. . . interrogation of a traveling companion," as objective fac-
tors going to the heart of whether reasonable suspicion was
present).

2

**[9]** We also disagree with Villasenor's assertion that the
fact that a search takes place at the border prohibits the gov-
ernment from relying on the extended border search doctrine
to justify a subsequent search of the same person or vehicle.
Indeed, we have previously rejected this argument.

In *United States v. Espericueta-Reyes*, special agent George
Cons learned from a reliable source "that a certain vehicle
containing contraband and displaying a certain [ ] license
plate was about to pass through the . . . Port of Entry." 631
F.2d 616, 618 (9th Cir. 1980). Customs agents decided that
they would allow the car through the port but would place it
under surveillance to "determine whether others were
involved . . . ." *Id.* Upon crossing the border, the "car was
routed to secondary inspection where it was searched," but
"[n]o contraband was found, and the car was allowed to pro-
ceed." *Id.* (footnote omitted). After crossing the border, the
car pulled into a gas station. Espericueta-Reyes, who was
standing by the gas pumps waiting, gave the driver of the car
what looked like money and then joined him in the car.
Shortly thereafter agents stopped the car. They conducted a
"cursory inspection" of the vehicle, but forestalled a more
extensive search due to dangerous traffic conditions. After

conducting a more extensive search at the port of entry, agents discovered heroin in the right rear wheel well.

Noting that "[t]he fact that a prior search ha[s] been conducted at the time of the initial border crossing is not dispositive of whether later searches are properly considered extended border searches," we upheld the search as a valid extended border search. *Id.* at 619; *see also United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1422 (9th Cir. 1984) ("[A]n extended border search can be valid even where the suspect was already searched at the initial border crossing."). In reaching this conclusion, we explained: "Clearly, the task of policing our borders would be made far more difficult, and the illicit activities of smugglers less risky, if an inspection at the border automatically foreclosed subsequent inspections by customs officials absent probable cause." *Espericueta-Reyes*, 631 F.2d at 620.

Similarly instructive, though not as factually on point, is the Seventh Circuit's opinion in *Yang*, 286 F.3d 940. There, Teng Yang and his cousin Lee Pao Yang, coming from Laos through Tokyo, arrived at Chicago's O'Hare International Airport. At customs, Teng was allowed to pass through after an x-ray of his luggage revealed nothing suspicious. Lee Pao, however, was randomly selected for a more extensive search, during which agents discovered that his luggage contained opium-soaked clothing. After further interrogation and investigation, agents discovered that Lee Pao was traveling on the same itinerary as his cousin, Teng. Their suspicions aroused, agents set out to find Teng, which they did a few minutes later. A thorough search of Teng's luggage revealed more opium-soaked clothes. The Seventh Circuit upheld the search as a valid extended border search. According to the court, the fact that Teng's luggage had been x-rayed at the border and that he had already passed customs mattered little. What mattered was that "[o]fficers had a reasonable certainty that Teng had crossed the border . . . and [that] they had a reasonable suspicion that criminal activity was occurring." *Id.* at 949.

**[10]** We suppose that in "striking a sensible balance between the legitimate privacy interests of the individual and society's vital interest in the enforcement of customs laws," *Caicedo-Guarnizo*, 723 F.2d at 1423, there could be instances where continual searches at or near the border would eventually become unreasonable despite formal satisfaction of the test for extended border searches. But wherever that line is, we are confident that the stop and search of Villasenor's car did not cross it.

## IV

The judgment of the district court is REVERSED.